IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GAIL M. KLINE and       )
CHESTER J. KLINE, JR.,     )
      )
      Plaintiffs,     )
      )
      v.       )     2:16cv1726
      )     **Electronic Filing**
**HAMPTON TOWNSHIP EMERGENCY** )
**MEDICAL SERVICES, INC.,**    )
      )
      Defendant.     )

## <u>OPINION</u>

Gail M. Kline ("Gail") and Chester J. Kline, Jr. ("Chester Jr.") ("plaintiffs") commenced

this employment discrimination action against Hampton Township Medical Services, Inc.

("Hampton EMS" or "defendant"). Presently before the court is defendant's motion for

summary judgment. For the reasons set forth below, the motion will be granted.

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(A). Rule 56 "'mandates

the entry of summary judgment, after adequate time for discovery and upon motion, against a

party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial.'" <u>Marten v.

Godwin</u>, 499 F.3d 290, 295 (3d Cir. 2007) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–

23 (1986)). Deciding a summary judgment motion requires the court to view the facts, draw all

reasonable inferences and resolve all doubts in favor of the nonmoving party. <u>Doe v. Cnty. of

Centre, Pa.</u>, 242 F.3d 437, 446 (3d Cir. 2001).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim.  Nat'l State Bank v. Fed. Reserve Bank of New York, 979 F.2d 1579, 1581-82 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. P. 56(E)) (emphasis in Matsushita).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" ... "and cannot simply reassert factually unsupported allegations."  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs."  Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992); Sec. & Exch. Comm'n v. Bonastia, 614 F.2d 908, 914 (3d Cir. 1980) ("[L]egal conclusions, unsupported by documentation of specific facts, are insufficient to create issues of material fact that would preclude summary judgment.").  Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion.  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990).  If the non-moving party's evidence is merely colorable or lacks sufficient probative force summary

judgment may be granted.  Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiffs establishes the background set forth below.  Hampton EMS is a family business.  Shirley Kline ("Shirley") was its original Executive Director, and served in that position until her death in 2011.  While she was alive, Chester Jr., her son, served as the Assistant Director in a part-time capacity, while his brother (Shirley and Chester Sr.'s other son) James Kline ("Jim") worked in a full-time capacity.  Jim became Hampton EMS's Chief of Operations in 2006.

After Shirley passed away Gail, Chester Jr.'s wife, was hired as Director while Chester Jr. maintained his role as Assistant Director.  Similarly, Jim's wife, Tracy Kline, was appointed as Secretary on Hampton EMS' Board of Directors.  The Board consisted of a Chairman, Treasurer, Secretary, and two Trustees.

When Gail was appointed as Director, it was understood that she was not going to assume all of Shirley's duties immediately.  Initially, she took over certain things and her duties included wheelchair transport scheduling and billing.  The Board understood that Jim was to have the same duties and authority he had prior to Shirley's death, notwithstanding having to share some of those duties with Gail.

During the course of her employment Gail repeatedly made errors regarding her responsibilities.  She attributes these errors to Jim not training her adequately.  Her errors caused frustration amongst Jim and other Hampton EMS employees.

Following her appointment as director, Gail and Chester Jr. became embroiled in a dispute with Jim as to who was in charge. Tension arose as to whether decisions between them were to be made separately, or in concert, and who had the highest authority. Significant disagreements began to arise in June of 2012, after Jim suspended an employee. Gail and Chester Jr. contacted him immediately and stated that he was not to hire, fire, or suspend any employee without their permission. Gail and Chester Jr. overturned Jim's decision and the employee returned to work. In another instance, Jim disciplined another employee, causing Gail and Chester Jr. to confront him about his failure to consult with them before acting. This resulted in a heated exchange between Chester Jr. and Jim.

The in-fighting continued. A short time later another incident occurred after a Hampton EMS ambulance broke down. Jim and Chester Jr. arrived on the scene, began to argue and the confrontation escalated. After this, Chester Sr. was made aware of the internal strife between Jim, Gail, and Chester Jr. In August of 2012, Chester Jr. made a report of suspected illegal activity by his brother, Jim, to the Pennsylvania State Police. As the rift between these three widened each side complained to Chester Sr.

The hostility between the family neared its peak when Chester Jr. told Chester Sr. that Jim called Gail a "stupid fucking cunt" to other Hampton EMS employees. Chester Sr. looked into the issue by asking Jim about the alleged comment. Jim denied that he said it and Chester Sr. took no further action.

Gail and Chester Jr. also frequently complained to Chester Sr. about other harassing conduct by Jim. These complaints reported that Jim was 1) undermining Gail's authority; 2) viewing pornography on office equipment while at work; 3) going through Gail's desk; 4) interfering with her computer access and 5) locking Gail out and blocking her from accessing

certain items. Chester Sr. responded by stating that he wished Gail, Chester Jr., and Jim "could get along."

Hampton EMS began to experience work-place disruption after the issues between the three escalated. John Koenig resigned because he wanted to get out of the "toxic environment" and he was "tired of being put in the middle between members of the Kline family." In his resignation letter, Mr. Koenig referenced the "game of tug-and-war [sic]" between Jim and the other family members. Soon after, Chester Jr. and Jim had an argument in Chester Sr.'s kitchen. After this event, Chester Sr. formed the belief that the in-fighting between Gail, Chester Jr. and Jim "was more than just a minor problem" and he needed to act quickly to fix the situation. It was at this point that he decided that Gail and Chester Jr. needed to be terminated. Chester Sr. called a meeting of the Board, which resulted in a decision to terminate Chester Jr. and Gail. A letter was sent to Gail and Chester Jr. detailing the decision of the Board and Chester Sr.'s personal feelings.

Defendant moves for summary judgment on several grounds. It contends that plaintiffs have failed to advance sufficient evidence to overcome the Board's explanation and support a finding that either plaintiff was subjected to any form of illegal discrimination or retaliation. More specifically, it asserts that plaintiffs have failed to supply sufficient evidence to support a finding that Gail was subjected to a work environment that was permeated with severe and pervasive harassment on account of her gender or that anything more than sporadic harassment by a non-supervising co-worker had occurred. Plaintiffs likewise have failed to adduce sufficient evidence which will support a finding that Gail suffered a materially adverse employment action as a result of her gender. Finally, defendant maintains that plaintiffs lack any evidence to show their termination was the product of a retaliatory motive by the Board.

Plaintiffs maintain that they repeatedly complained about sexually harassing conduct and adverse actions in the workplace.  Thereafter, claims of deficient performance were manufactured against Gail in an effort to remove her and it was her complaints about Jim's illegal and harassing conduct that directly brought about their termination.  In other words, plaintiffs argue there is sufficient evidence to support each Title VII and PHRA claim.

Plaintiffs have failed to advance sufficient evidence to support a claim for disparate treatment.  It is well-settled that claims of discrimination are to be evaluated at summary judgment using the shifting burdens of proof initially established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  St. Mary Honor Center v. Hicks, 509 U.S. 502, 506 (1993); Waldron v. SL Industries, Inc., 56 F.3d 491, 495 (3d Cir. 1995) (citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).  Under this framework, the parties' respective evidentiary burdens have been summarized as follows:

> First, the plaintiff has the burden of proving by
> the preponderance of the evidence a prima facie case of
> discrimination.  Second, if the plaintiff succeeds in proving
> the prima facie case, the burden shifts to the defendant to
> articulate some legitimate, nondiscriminatory reason
> for the [adverse employment action].  Third, should the
> defendant carry this burden, the plaintiff must then have
> an opportunity to prove by a preponderance of the evidence
> that the legitimate reasons offered by the defendant were
> not its true reasons, but were a pretext for discrimination.

Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-253 (1981) (citation omitted).

Under the indirect evidence approach, a plaintiff must present a prima facie case of discrimination.  Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997).  The major purpose of the prima facie case is to eliminate the most obvious lawful explanations for the defendant's adverse employment action and raise a presumptive inference of discrimination.

Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 352 (3d Cir. 1999) (citing Burdine, 450 U.S. at 253-54 ("[t]he prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection.")). A prima facie case raises an inference of discrimination because the presumed circumstances, if left unexplained, indicate it is likely that the defendant's actions were based on consideration of impermissible factors. Id. (quoting Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1978)).

There is no talismanic formula for presenting a prima facie case. Jones v. School District of Philadelphia, 198 F.3d 403, 411 (3d Cir. 1999) ("the elements of a prima facie case depend on the facts of the particular case"). The relevant inquiry is whether the plaintiff has suffered an adverse employment action under circumstances which raise an inference of unlawful discrimination. Waldron, 56 F.3d at 494. Plaintiff's burden at this step is "minimal" and is viewed as a means of presenting a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. Id.; see also Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1978).

If the plaintiff presents a prima facie case, the second stage of the McDonnell Douglas paradigm requires the defendant to articulate a legitimate explanation for the adverse employment action. Keller, 130 F.3d at 1108. The defendant's burden at this step is one of production, not persuasion, and the court's consideration of it "can involve no credibility assessment." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993). If the defendant meets this burden, the presumption of discrimination created by the prima facie case "drops" from the case. St. Mary's Honor Center, 509 U.S. at 511; Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000).

Once the defendant has met its burden of production and provided a legitimate explanation for its adverse employment action, the court's analysis turns to the third and final step of the inquiry, which is usually the most critical in resolving a motion for summary judgment. Jones, 198 F.3d at 410. At this juncture, the plaintiff must be afforded the "opportunity to [present evidence that is sufficient to] prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253. At trial, the plaintiff must have evidence that could convince the finder of fact "both that the [defendant's] reason was false, and that discrimination was the real reason." St. Mary's Honor Center, 509 U.S. at 515. This is because while the burden of production under the McDonnell Douglas analysis shifts, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Jones, 198 F.3d at 410 (quoting Burdine, 450 U.S. at 252-53 (1981)).

In general, a plaintiff may establish a prime facie case by demonstrating that (1) she is a member of a protected class, (2) she is qualified for the position, (3) she suffered an adverse employment action, and (4) the circumstances raise an inference of discrimination, such as where similarly situated individuals outside the protected class were treated more favorably. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002); see also Sheridan v. E. I. DuPont de Nemours & Co., 100 F.3d 1061, 1066 n.5 (3d Cir. 1996) (en banc), cert. denied, 521 U.S. 1129 (1997) (discussing nature and purpose of prima facie case). The central focus of the inquiry is always whether the employee is being treated less favorably because of a protected trait, such as gender. Pivirotto, 191 F.3d at 352 (quoting International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977)). In short, the plaintiff must be able to point to "evidence adequate to

create an inference that an employment decision was based on illegal discriminatory criterion."

Id. at 355. (quoting O'Connor v. Consolidated Coin Caterer's Corp., 517 U.S. 308, 312 (1996)).

The United States Court of Appeals for the Third Circuit has summarized the plaintiff's burden at summary judgment on this step as follows:

> Specifically, in Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994), and later in Sheridan v. E.I. Dupont de Nemours and Co., [100 F.3d 1061 (3d Cir. 1996) (en banc)], we stated that a plaintiff may defeat a motion for summary judgment (or judgment as a matter of law) by pointing "to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer action." Fuentes, 32 F.3d at 764; Sheridan, 100 F.3d at 1067.

Jones, 198 F.3d at 412-13. Under the first approach, the finder of fact's rejection of the defendant's proffered explanation allows, but does not compel, a finding of discrimination and judgment for the plaintiff. Sheridan, 100 F.3d at 1061; Reeves, 530 U.S. at 147 ("In appropriate circumstances the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."). In other words, once a defendant's justification has been discredited, a jury is entitled to infer that discrimination is the most likely alternative explanation, particularly because the defendant is in the best position to explain the actual reason for its decision. Reeves, 530 U.S. at 147. "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Id. at 148; Sheridan, 100 F.3d at 1061 (same).

"To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether

discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765. Instead, the plaintiff must come forward with evidence that demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." Id. (citations omitted). In meeting this burden, the plaintiff need not cast doubt on every explanation advanced by the defendant, but rather is only required to present sufficient evidence from which a factfinder reasonably could infer that each of the employer's proffered non-discriminatory reasons is unworthy of credence. Id. at 764. For example, "[i]f defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder." Id. at 764 n.7. "That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available." Id.

A plaintiff may also survive summary judgment at the third stage of the McDonnell Douglas analysis by identifying evidence which would permit the finder of fact to infer that invidious discrimination was more likely than not a motivating or determinative cause of the adverse employment action. "For example, the plaintiff may show that the employer has previously discriminated against [the plaintiff], or that the employer has previously discriminated against other persons within the plaintiff's protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998). In making this demonstration, the plaintiff "cannot selectively

choose a comparator" amid a sea of employees who are otherwise treated equally with the plaintiff, but instead must point to evidence that is probative of unequal treatment motivated by discriminatory animus. Id. at 645-647.

Here, plaintiffs' claim of disparate treatment must be evaluated under the McDonnell Douglas burden-shifting framework. Defendant does not challenge whether plaintiffs have set forth a prima facie case of discrimination. Defendant has proffered a non-discriminatory reason for the termination. Plaintiffs do not pursue liability on a theory that the evidence will support a finding that Gail's gender was more likely than not a determinative factor in her termination in the absence of pretext. Therefore, this court is left to determine whether the plaintiffs have sufficient evidence to support a finding that defendant's proffered explanation was pretextual.

Plaintiffs have failed to produce sufficient evidence to show that defendant's reasons were unworthy of belief and a pretext for discrimination. Plaintiffs point to little more than conjecture to support the proposition that Gail was being treated less favorably because of her sex.

Viewing the facts in the light most favorable to plaintiffs, the record reflects that Gail's performance was deficient. Jim, who was supposed to be training Gail, told her on numerous occasions that she was not doing her job properly and was billing incorrectly. (James Kline Depo. Trans. pp. 125-127). He also complained to Dan Balk about her performance. (Dan Balk Deposition Transcript pp. 24-25). However, Gail believed that Jim was not giving her the appropriate training. (Gail Kline Depo. Trans. p. 33). Tracy Kline, Jim's wife, testified that Jim would bring home work that Gail was supposed to be doing. (Tracy Kline Deposition Transcript. pp. 4-5). Chester Sr. indicated he formed the belief that she should be terminated because she was not doing her job properly. (Chester Kline Sr. Deposition Transcript 78-79).

Chester Sr. referenced the improper filing of memberships and the failure to complete trip sheets properly. Id. He also referenced the apparent "power struggle" between his sons and the coercive effect it was having on the defendant. Furthermore, Chester Sr. believed that Chester Jr. and Gail were behind the resignations of several employees over a short period of time. (Gail Kline Depo. Trans. 101-102; 115-116).

Following an incident where Jim and Chester Jr. were arguing, Chester Jr. "flicked the trigger" on his gun in a threatening manner towards Jim and offered to settle it outside. Chester Sr. witnessed this confrontation and decided he needed to talk to the Board about the ongoing state of affairs. (Chester Kline Sr. Depo. Trans 25-26).

A board meeting was subsequently scheduled for April 25, 2013, and Chester Sr., Tracy, and Nancy Perestock (all family members) attended. (Id. at 26; Hampton EMS Meeting Minutes from April 25, 2013). Nancy Higgins and Tracy Maggiorini (non-family members) refused to attend. Id. According to Chester Sr., the meeting was called due to personnel issues and family conflicts, specifically the termination or resignation of Director Gail and Assistant Director Chester Kline Jr. Id. According to the meeting minutes, the members discussed Gail's failure to do her job adequately. Id. It was noted that she did not listen to Jim on the proper way to bill. For example, she repeatedly billed "UPMC for you" and "UMPC for life" for wheelchair and van trips after she was told multiple times that such practices were incorrect. Id. Jim had reiterated the proper way to bill, but she failed to heed his instructions. This resulted in false claims and a loss of income for Hampton EMS. Id. Her failure to answer telephone calls also was attributed to Hampton EMS losing wheelchair and van trips which had dropped in number from about twelve to one a day. Id. at 1-2. The minutes also indicated Gail did not finish the 2011-2012 and 2012-2013 subscriptions, which cost Hampton EMS approximately $38,000.00.

Id. at 2.  In this regard, Gail took home the 2012-2013 subscription cards but never brought them back to Hampton EMS for filing.  Id.

The attending members of the Board also highlighted that Gail and Chester Jr. undermined Jim's authority in front of employees, which in turn resulted in employees neither responding to Jim nor following his orders.  Id.  Near the end of the meeting, Chester Sr. motioned that Gail be given the option to resign or be terminated and her position be eliminated. Id. at 3.  Chester Sr., Nancy Perestock, and Tracy Kline all voted in agreement.  Id.

Another motion was made to terminate Chester Jr. or give him the option to resign.  Id. The meeting minutes indicated that Chester Jr. had been asked to communicate with Jim and help run Hampton EMS effectively, but Chester Jr. had refused to do so.  They also reflected an event which had occurred just prior to the meeting wherein Chester Jr. had gone to the home of Chester Sr. and called him derogatory names.  He also threatened to destroy Chester Sr. and Hampton EMS.  Id. at 3-4.  It was decided that Chester Jr. would be terminated and given severance pay.  Id. at 4.  In turn, Jim's title would be changed from Chief of Operations to Chief Executive Officer.  Id.

Plaintiffs assert that the elimination of Gail's position and her "replacement" with Jim raises the inference of discrimination.  But the record strongly supports the inference that Jim was the most logical replacement for Gail and it reflects that he was training her in any event. Given this constellation of circumstances, Gail's replacement by Jim does not raise any forceful inference of discrimination because he presumably had held a similar position and he had already performed or knew how to perform Gail's duties.

Against this backdrop, plaintiffs' evidence to support a finding of pretext falls short of the mark.  Plaintiffs assert that Gail's "replacement" by Jim raises the inference of disparate

treatment based on gender. But even setting aside the forceful fact that the operation was a family-run business, the facts and circumstances of record undermine significantly any inference of gender bias.

Moreover, plaintiffs' attempts to identify inconsistent explanations for the termination by highlighting what was discussed prior to the Board's vote and the reasons stated in the termination letter amount to little more than a superficial exercise in semantics. The termination letter stated in reference to Gail that recent turnover rates, Gail disrespectfully threatening Jim physically, and Gail failing to acknowledge Jim's presence were the reasons for her termination. Apart from these reasons, the bulk of the letter focused on the situation as a whole, the problems within the family, and Chester Sr.'s personal relationship with Chester Jr. Id. The letter also referenced the vandalism that occurred the night before at Hampton EMS' office and noted that footage existed revealing that Gail and Chester Jr. had been on the premises that night and had been handling or near objects found to be broken or missing. Id.

These purported differences between the focus of Gail's performance in the minutes of the Board meeting and the increasing family strife and dysfunction in the termination letter hardly amount to contradictions that undermine defendant's proffered explanation. To the contrary, the termination letter merely augments different reasons that also were discussed at the Board meeting. Quibbling of this nature is insufficient to support a finding of pretext. See Fuentes, 32 F.3d at 765 (Demonstrating that the decision was wrong or unwise does not discredit the employer's explanation to a degree that permits a sound inference of discriminatory motive).

Plaintiffs have failed to put forth sufficient evidence to support a finding that defendant's proffered reasons for plaintiffs' termination were unworthy of belief and/or discriminatory in nature. Raising an inference of discriminatory animus at this stage means the plaintiffs must do

more than show that the defendant's decisions were wrong or mistaken. To the contrary, they must show that the Board's decision was motivated by a discriminatory animus.

Significantly, plaintiffs do not counter the allegations of Gail's poor performance – and, they put forth insufficient evidence to suggest that 1) not only were the proffered reasons unworthy of belief, but 2) that they were pretext for discrimination. As previously discussed, plaintiffs' contention that the elimination of Gail's position and Jim's simultaneous promotion raise an inference of discrimination is of minimal force. More importantly, Gail was terminated by the Board, which included two female members who voted for her termination. Gail was assertedly terminated for her poor work performance and because of the significant infighting between her, her husband, Chester Sr., and Jim. There is little beyond rank speculation to show that a majority of the Board did not decide to end Gail and Chester Jr.'s services for these reasons and instead sought to terminate Gail because of her gender. In fact, such evidence is virtually non-existent. Even though plaintiffs do not need to cast doubt on every explanation advanced by defendant, plaintiffs' efforts to meet their burden by highlighting that Jim replaced Gail and the purported inconsistent reasons in the Board minutes and termination letter fall short of the legal standard. Consequently, plaintiffs have failed to produce sufficient evidence to support their claim of disparate treatment based on gender.

Plaintiffs also have failed to advance sufficient evidence to support a claim of hostile work environment. Specifically in dispute is whether the conduct in question can be found to have been perpetrated on account of gender and whether the workplace was permeated with severe and pervasive hostility. Plaintiffs' evidence is sufficient to support a finding that the highlighted conduct was perpetuated "based on gender." In contrast, it misses the mark on the element of severe and pervasive.

Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits discrimination "against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000 e–2(a)(1). The prohibition "not only covers 'terms' and 'conditions' in the narrow contractual sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment of [protected employees] in employment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (quoting Meritor Savs. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)). "Title VII is violated 'when the workplace is permeated with discriminatory [gender-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 331 (4th Cir. 2003) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 215 (1993)). Title VII is designed to protect against "working environments [that are] so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers." Meritor, 477 U.S. at 66 (quoting Rodgers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971)).

A plaintiff alleging a sexually hostile work environment must establish the following elements: (1) the employee suffered intentional discrimination because of her gender; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 276–77 (3d Cir. 2001). Proffering sufficient evidence to meet each element of a hostile work environment claim generally precludes

summary judgment in the defendant's favor and permits the plaintiff to proceed to trial.  Id. at 280–281.

In general, the Supreme Court's cases in the area have taken "a middle path between making actionable conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury."  Harris, 510 U.S. at 21.  Striking such a balance is necessary to maintain the distinction between objectively hostile or abusive work environments that violate Title VII's broad rule of workplace equality and simple teasing, offhand comments and isolated incidents that are beyond its reach.  Id.; Clark County v. Breeden, 532 U.S. 268, 271 (2001).  The Supreme Court has emphasized that the standards for judging hostility must remain sufficiently demanding so that Title VII does not become "a general civility code."  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  "The question of 'whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Moody v. Atlantic City Board of Educ., 870 F.3d 206, 214 (3d Cir. 2017) (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001)).

The workplace conduct underlying a harassment claim is not to be measured in isolation. Instead, it is to be assessed "by looking at all the circumstances."  Clark County, 532 U.S. at 270. In analyzing whether a plaintiff has established a prima facie case, the court cannot confine its analysis to "the individual pieces of evidence alone," but must "view the record as a whole picture."  Id. at 276 (citing Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir. 1997)).  This is because "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual

incidents, but the overall scenario." Id. (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990)).

"Employers may be liable for either a supervisor's or a co-worker's discriminatory acts." In re Tribune Media Co., 902 F.3d 384, 399 (3d Cir. 2018). An employer is strictly liable for a supervisor's actions "[i]f the supervisor's harassment culminates in a tangible employment action." Id. (quoting Vance v. Ball State Univ., 570 U.S. 421 424 (2013)). However, when the hostile work environment is created by a co-worker, employer liability only exists where "(1) the employer failed to provide a reasonable avenue for the complaint or . . . [(2)] the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." Id. (quoting Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104 (3d Cir. 2009)).

Defendant alleges the conduct that took place was not based on sex. But the record evidence will support a finding that Gail often was referred to as a "stupid fucking cunt" behind her back; she occasionally was subjected to others watching pornographic materials in the workplace, and she witnessed sexual pop-up ads inviting her to view pornographic material on her computer. This conduct was perpetrated by or traceable to Jim.

"The intent to discriminate based on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course." Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 n.3 (3d Cir. 1990). Gail was the subject of sexually derogatory name-calling, caused to witness others watching pornography and subjected to pop-up advertisements on her computer. This conduct is significant enough to be recognized as conduct being perpetrated on account of gender.

The third and fourth elements appear to be undisputed and therefore it will be assumed the facts adduced will support a finding that the workplace environment detrimentally affected Gail and that a reasonable person in her position would have found the conduct to be sexually hostile or abusive. Furthermore, plaintiffs appear to take the position that Jim and Gail were equals and neither party advances significant argument about the fifth element.[1] Accordingly, we turn to the second and fifth elements.

Plaintiffs have failed to meet their burden as to the second element. More specifically, plaintiffs have failed to proffer sufficient evidence to support a finding that the hostile conduct rose to the level of severe and pervasive.

Plaintiffs assert the following detailed facts create a sufficiently severe and pervasive hostile work environment. Jim repeatedly referred to Gail by the use of a derogatory and demeaning phrase. Gail admits that Jim never called her a "stupid fucking cunt" to her face. (Gail Kline Depo. Trans. pp. 85-86). There are several instances where others testified that on repeated occasions Jim referred to Gail behind her back by using this phrase. There was one instance where Gail overheard Jim say "she's a cunt." Id. On this occasion Gail asked Jim if he was talking about her, and he laughed, did not confirm he was talking about her and said he did not like her attitude. Gail also alleges she was undermined by Jim. She testified that Jim told employees that she meant nothing and they should not to listen to her or follow her orders. Id. at 81-82.

Next, Gail buttresses her claim on the grounds that she once saw Jim put pornography on his screen and believes she overheard him watching it on another occasion. The record read in

---

[1] Plaintiffs' explicit reliance on the aspects of the record that will support a finding that Jim was undermining Gail's authority in the workplace effectively undermine any contention that Jim was Gail's supervisor.

the light most favorable to her indicates Jim called a few guys into his office to look at his computer. Id. at 70-71. Gail heard what she believed were porn noises, *walked over* to Jim's computer, looked at the monitor, saw that porn was playing and told Jim to stop playing it, which he did. Id. In a second instance, Gail saw Jim on his cellphone right outside her office with a few others. Id. at 73-74. She believed they were watching pornography because she overheard them saying "Look at this. Look at her. Isn't she disgusting, the position." Id. On this occasion, Gail told him to "just knock that stuff off" and she did not actually see or hear anything that was pornographic in nature. Id. at 74.

Gail further explains that she would get pornographic pop-ups on her computer, which happened a few times. These consisted of images and ads akin to "Hot Asian Girls", or "Hot Porn Sex." When these occurred she would click them off and close them out. Id. at 75-76). Dan Balk witnessed the popups on Gail's computer and testified that he previously had witnessed Jim use it to watch pornography. (Dan Balk Depo. Trans 10-13).

Finally, Gail asserts a litany of events which she claims reflect sexually-charged hostility through circumstantial evidence and by inference. She alleges someone went through her desk and several items were removed, including billing software and training manuals. Gail testified that Jim took the manual she needed, "certain trips," and a billing book manual. (Gail Kline Depo. Trans pp. 96-97). However, Gail was unaware if it was Jim who did this, but respectively, she believed he was the only one with access to that particular office. Id. at 40. Gail also believed that someone went through her desk about once a week, and viewing the facts in the light most favorable to her the court will assume it was Jim. Id. at 118. Gail further asserts that Jim installed keystroke "spyware" on her computer without her consent or knowledge. She knew that Jim had someone install the software on her computer or that Jim did it himself. (Id.

at 125; Dan Balk Depo. Trans 19-20). According to Dan Balk, Jim stated he was just "keeping an eye on Gail" when questioned about what he was doing. Id. 18-21.

In addition, Gail maintains that Jim's "sexually harassing conduct" extended to him discussing and joking with subordinates about her medical condition. Gail was told that Jim was watching her on the video to see how many times she used the restroom and that he would make fun of how many times she had to go. All of this was based on her Irritable Bowel Syndrome (IBS) symptoms. Id. at 133. However, Gail only learned about this at her unemployment hearing, which occurred after her termination, and she did not know about it at the time that it was occurring. Id.

The defect in plaintiffs' position is that nearly everyone but Gail witnessed Jim's harassing conduct on a number of occasions, but his harassing conduct was directed at her in only a few instances. To be sure, Plaintiff's evidence establishes that Gail was subjected to sexual harassment in the workplace. The record will support a finding that Jim used a derogatory and sexually charged phrase to refer to Gail and viewed pornographic material at locations where Gail became aware of his conduct. He also sought to undermine her authority with subordinate workers on more than one occasion. And each of these forms of conduct occurred more than once.

Nevertheless, plaintiffs lack sufficient evidence to support a finding that the workplace was permeated with sexually-charged hostility or that it was polluted to a degree that it changed the terms or conditions of employment. The derogatory name calling/sexual slurs occurred only on a handful of occasions, all occurred outside of Gail's presence, and she was not directly exposed to this conduct. Similarly, Jim's watching pornography in the workplace was limited to a few occasions and ceased when Gail demanded he stop. The allegations that Jim used Gail's

computer in a way that caused pop-up ads to occur while she was using it is at best a loosely connected inference and appears to be based on little more than speculation. And such pop-ups occurred only on a few occasions in any event.

The aforementioned conduct does not create a workplace permeated with discriminatory intimidation, ridicule, and insult that is sufficient to create an abusive work environment. At base, the environment that Gail describes, although distasteful, is not so polluted with discrimination as to "destroy completely the emotional and psychological stability of minority group workers." Meritor, 477 U.S. at 66 (quoting Rodgers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971)). Nor is the conduct severe enough to transcend the restrictions that preclude Title VII from operating as a general civility code.

In short, the evidence of record when viewed in the light most favorable to plaintiffs does provide evidence of conduct that is offensive. Nevertheless, what occurred here does not rise to the level of conduct that altered the terms and conditions of employment and materially interfered with an employee's work performance.

Finally, plaintiffs cannot proceed on their claim for retaliation. A prima facie case of retaliation requires a plaintiff to proffer evidence demonstrating that "(1) she engaged in protected conduct; (2) after or contemporaneous with engaging in that conduct, her employer took an adverse action against her; (3) the adverse action was 'materially adverse'; and (4) there was a causal connection between her participation in the protected activity and the adverse employment action." Hare v. Potter, 220 Fed. Appx. 120, 127 (3d Cir. 2007). With respect to the final element, the Third Circuit has stated that under certain circumstances temporal proximity alone can be sufficient to establish an inference of causation between the adverse action and the employee's protected activity. See Farrell v. Planters Lifesavers Co., 206 F.3d

271, 279 80 (3d Cir. 2000); <u>see also</u> <u>Sabbrese v. Lowe's Home Centers, Inc.</u>, 320 F. Supp.2d 311, 323 (W.D. Pa. 2004) (listing Third Circuit decisions discussing temporal proximity). Plaintiffs' retaliation claim is controlled by the three-step burden shifting <u>McDonnell Douglas</u> analysis as outlined above. <u>See</u> <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 342 (3d Cir. 2006) ("If the employee establishes a prima facie case of retaliation, the familiar <u>McDonnell Douglas</u> approach applies.").

In <u>Burlington N. and Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 67 (2006), the Supreme Court clarified that the anti-retaliation provision is not limited to "workplace-related or employment-related retaliatory acts and harm." Furthermore, it is not to be construed as "forbidding the same conduct prohibited by the antidiscrimination provision." <u>Id</u>. Instead, retaliatory actions can be found to be "materially adverse" if they would have the effect of "dissuad[ing] a reasonable worker from making or supporting a charge of discrimination." <u>Burlington</u>, 548 U.S. at 68 (what is materially adverse "often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed").

The record also must contain sufficient evidence from which the finder of fact can link the materially adverse action to retaliatory animus. <u>Moore</u>, 461 F.3d at 346. Two central factors are brought into play: (1) the "temporal proximity" between the protected activity and the alleged retaliation and (2) the existence of any "pattern of antagonism in the intervening period." <u>Jensen v. Potter</u>, 435 F.3d 444, 450 (3d Cir. 2006) (quoting <u>Abramson</u>, 260 F.3d at 288 (quoting <u>Woodson</u>, 109 F.3d at 920-21)). "Timing alone raises the requisite inference when it is "unusually suggestive of retaliatory motive." <u>Id</u>. "But even if temporal proximity . . . is missing, [it is appropriate to] look to the intervening period for other evidence of retaliatory animus." <u>Id</u>.

(quoting <u>Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 503-04 (3d Cir.1997)). However, "[t]hese are not the exclusive ways to show causation" and it is important to consider all of the proffered evidence as a whole to determine whether it "may suffice to raise the inference." <u>Id</u>. (quoting <u>Farrell</u>, 206 F.3d at 280 and citing in support <u>Kachmar v. SunGard Data Systems, Inc.</u>, 109 F.3d 173, 178 (3d Cir.1997) ("The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context specific.").

Plaintiffs assert they made approximately six complaints over the course of nine months to Chester Sr. The specific contents of these complaints are not contained in the record. An inference can be drawn that these complaints highlighted the above-referenced aspects of Jim's conduct. Chester Sr. did not conduct an investigation into the complaints other than asking Jim if he in fact used the derogatory term to refer to Gail and when Jim denied it, Chester Sr. believed him. (Chester Kline Sr., Depo. Trans. pp. 21; 59 – 60; 65). Chester Sr. explained that he did not investigate the complaints further because he did not believe the name calling or viewing pornography had occurred. <u>Id</u>. Furthermore, he did not inform the Board of plaintiffs' claims. (<u>Id</u>. at 106).

Plaintiffs contend the temporal proximity between the last complaint and the termination supply the needed causal inference because there were only ten days between the two. But plaintiffs have failed to advance evidence that suggests Chester Sr. informed the Board about their complaints. This in itself defeats any contention that adequate evidence exists to support a finding of the causal link.

Moreover, plaintiffs do not dispute that Chester Sr. would act on his own most of time without consulting the Board. (Gail Kline Depo. Trans. pp. 42-45). And three of the five members of the Board were at the meeting. (Hampton EMS Meeting Minutes from April 25,

2013).  All were members of the Kline family and all voted to terminate plaintiffs upon Chester

Sr.'s recommendation.  (Hampton EMS Meeting Minutes from April 25, 2013).

The meeting minutes indicate that Gail's performance and the escalating family in-

fighting and dysfunction were the reasons Chester Sr. had decided to move forward with the

termination.  There is no evidence that he perceived plaintiffs' complaints as anything other than

the product of infighting amongst the family members.  Nor is there any basis to infer that he

found them to be a potential for adverse consequences to himself or Hampton EMS.  Thus, an

inference that there is evidence to support a finding that Chester Sr. and the Board acted in

retaliation virtually is non-existent.

Against this backdrop, plaintiffs' contention that the causal link is supported sufficiently

by the absence of the two non-family Board members is misplaced.  Ms. Maggiorini and Ms.

Higgins refused to attend the meeting because it was being held without the plaintiffs'

knowledge and they believed there were insufficient grounds for termination.  (Nancy Higgins

Deposition Transcript pp. 6-9; Tracy Maggiorini Deposition Transcript pp. 14-17).  But when

informed of their refusal to attend, Chester Sr. told Ms. Higgins that her vote as well as Ms.

Maggiorini's would be unnecessary because he already had a majority of the Board in support of

his position.  (Tracy Maggiorini Depo. Trans. pp 18-19; Nancy Higgins Depo. Trans. 22-25).

Once again, these facts merely support the explanation in the meeting minutes and fail to contain

any sound basis to infer a retaliatory motive or intent.  Consequently, plaintiffs have failed to

adduce sufficient evidence to support a finding that a causal link existed between their

complaints and the Board's decision.

For the reasons set forth above, defendant's motion for summary judgment will be

granted.  An appropriate order will follow.

Date: April 26, 2019

s/David Stewart Cercone<br>
David Stewart Cercone<br>
Senior United States District Judge

cc:    Joel S. Sansone, Esquire
        Elizabeth Tuttle, Esquire
        Alan T. Silko, Esquire
        Robert C. Bechtell, Jr., Esquire

        (*Via CM/ECF Electronic Mail*)